# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TILOT OIL, LLC,

                    Plaintiff,

v.                                                    Case No. 09-CV-210-JPS

BP PRODUCTS NORTH AMERICA, INC.,

                    Defendant.                        ORDER

On June 30, 2011, the parties in this action filed cross-motions for summary judgment (Docket #67, #75). The case arises under the Resource Conservation and Recovery Act's citizen suit provision, 42 U.S.C. § 6972, as well as Wisconsin tort law. Plaintiff Tilot Oil, LLC ("Tilot") has essentially alleged that defendant BP Products North America, Inc. ("BP") is liable for petroleum-contaminated groundwater that is impairing the use of buildings on Tilot's property. The court will deny Tilot's motion for summary judgment, and grant BP's motion in part.

In the time these motions have been pending, BP has also filed a Motion to Strike (Docket #120) and a Motion for Leave to File Supplemental Memorandum, Proposed Facts, and Affidavit (Docket #125). The Motion to Strike requests the court strike certain exhibits and portions of exhibits from the record, submitted by Tilot in support of its motion for summary judgment and in opposition to BP's motion. The motion for leave to file requests that certain exhibits, only available after filing the original submissions, be added to the record along with a supplemental memorandum. Both motions will be denied, with the understanding that the

parties may move *in limine* later regarding the admissibility of evidence at trial.

1.    Background

Tilot owns and operates a parcel of land in Green Bay, Wisconsin, adjacent to the Fox River ("Tilot Site"). (Stipulated Facts ¶¶ 2, 4) (Docket #69). Prior to Tilot's ownership, the site, made up of three parcels, was owned by a number of parties before its transfer to Wolf Acquisition, LLC, in 2003. (Stipulated Facts ¶¶ 6-7); (June 30 Schaefer Aff. ¶ 9 & Ex. 51) (Docket #71).[1] Craig Wolf is the manager of Tilot. (Stipulated Facts ¶ 5). Among the prior owners in the chain of title, BP owned the Tilot Site at one point and operated a bulk oil storage and distribution terminal on the site.[2] (Stipulated Facts ¶¶ 7-8). Most recently, Wolf Acquisition, LLC, purchased the Tilot Site from Tilot Oil Company, Inc., Donald Tilot, and Jeffrey Tilot. (Stipulated Facts ¶ 6); (June 30 Schaefer Aff. ¶ 9 & Ex. 51). Currently, Tilot's Buildings D, E, and C are located along the Tilot Site's north property boundary. (Stipulated Facts ¶ 3). BP also owned a parcel of land north of the Tilot Site, on which it likewise owned and operated a bulk oil storage and distribution terminal ("BP Site"). (Stipulated Facts ¶ 14).

Releases of petroleum products and/or constituents have occurred at the BP Site both prior to 1982 and subsequent to 1987. (Stipulated Facts ¶ 20).

---

[1] While the stipulated facts state that "Tilot Oil Acquisition, LLC" purchased the site, the chain of title search attached as Exhibit 51 to the affidavit of Pamela Schaefer lists "Wolf Acquisition, LLC" as the party receiving the deed. The court will refer to Wolf Acquisition, LLC.

[2] The parties have stipulated that a number of predecessor or related entities owned land and conducted various operations for which BP is now the proper party defendant. (*See* Stipulated Facts ¶¶ 8-11). As such, the court will refer to BP for simplicity's sake.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 2 of 35   Document 137

The releases contained fuel oil, diesel fuel, and gasoline. (Stipulated Facts ¶ 22). Reports from 1991 show the presence of a plume of petroleum contamination on the Tilot Site beneath Building D. (Def.'s Resp. to Pl.'s Proposed Material Facts [hereinafter DRPMF] ¶ 27) (Docket #101). The petroleum plume extending from the BP Site to the Tilot Site contains both "free product" as well as dissolved phase petroleum. (DRPMF ¶¶ 30-31).[3] Dissolved phase petroleum contamination extends beyond the southern boundaries of the free product plume and onto the Tilot Site. (Stipulated Facts ¶ 23). The free product plume's existence on the Tilot Site is due at least in part to migration from the BP Site. (DRPMF ¶¶ 35, 47, 49). At the same time, it is undisputed that some spills also occurred on the Tilot Site itself, in the vicinity of Building D. (Pl.'s Resp. to Def.'s Proposed Material Facts [hereinafter PRPMF] ¶ 5) (Docket #95). However, the parties vigorously dispute whether these spills may have contributed to groundwater contamination now affecting Building D. (*See, e.g.*, PRPMF ¶¶ 11-12 & Responses). In any event, when the water table level rises above the elevation of the basement floor slab of Building D, groundwater contaminated with petroleum constituents has been observed above the floor slab. (DRPMF ¶ 51). The plume does not, however, threaten the nearby Fox River. (Pl.'s Resp. to Def.'s Add'l Proposed Material Facts ¶ 5) (Docket #109).

Numerous tests have been done in and around Building D in order to determine the level of health risk presented by the contamination. Around February 2005, Tilot installed a ventilation fan in the basement of Building D. (PRPMF ¶ 80). Various parties have taken a number of air samples for

---

[3]Free product is also known as light non-aqueous phase liquids ("LNAPL"). (DRPMF ¶ 30).

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 3 of 35   Document 137

benzene, which happens to have the lowest Occupational Safety and Health Administration ("OSHA") permissible exposure level ("PEL") of any hydrocarbon associated with petroleum products.[4]  (PRPMF ¶¶ 77, 81). These tests, from June 2006 through June 2011, total fifteen air sampling events, each event including a number of individual samples from various areas on the Tilot Site, including the basement of Building D.  (PRPMF ¶ 81); (Aug. 24 Schaefer Aff. Ex. 81-A) (Docket #97-11).

The parties dispute what legal standards ought to be applied to the various benzene concentration samples, as well as the validity of certain samples based on the methods used, but for the sake of setting out the factual bases, sampling has shown concentrations of: 63 μg/m³ in Building C, 360 μg/m³ in Building E, 2,700 μg/m³ on the first floor of Building D, and 2,000 μg/m³ to 5,700 μg/m³ in the basement of Building D in March 2008; 10 μg/m³ on the first floor of Building D and 43 μg/m³ to 94 μg/m³ in the basement of Building D in March 2009; and 64 μg/m³ to 110 μg/m³ on the first floor of Building D and 240 μg/m³ to 320 μg/m³ in the basement of Building D in June 2009.  (June 30 Drought Aff. ¶ 7(b)-(c) & Ex. 2) (Docket #73-2).  The highest concentration of benzene detected, 5,700 μg/m³ in the basement of Building D in March 2008, equates to 1,800 parts per billion by volume ("ppbv"), or 1.8 parts per million ("ppm").  (June 30 Drought Aff. ¶ 7(c)).  During prior sampling events in 2006 and 2007, concentrations of benzene in Building D never exceeded 50 μg/m³ and often remained below 20 μg/m³.  (June 30 Schaefer Aff. ¶ 2(jj) & Ex. 36).  In sum, none of the sampling for benzene has

---

[4]OSHA PELs are used to determine employee exposure to hazardous substances in the workplace and protect them from health effects.  (PRPMF ¶ 75). The parties dispute the appropriateness of using OSHA PELs, but those are legal arguments and the court deals with such later.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 4 of 35   Document 137

shown concentrations exceeding the OSHA PEL of 1.0 ppm except for the 1.8 ppm result in March 2008, (DRPMF ¶ 6); (PRPMF ¶ 77).[5] March 2008 samples also exceeded the National Institute for Occupational Safety and Health's ("NIOSH") recommended exposure limit for benzene of 319 μg/m³ and the U.S. Environmental Protection Agency's ("EPA") Region III Industrial Indoor Air Screening Level of 1.6 μg/m³.[6] At some points, these various samples have also exceeded Wisconsin's vapor action level ("VAL") for benzene of 16 μg/m³. Moreover, during the March 2008 sampling, Theodore Hogan performed four additional samples in the basement of Building D—as with the other March 2008 samples, the ventilation fan was turned off. (Aug. 24 Schaefer Aff. Ex. 81-A). Those four additional samples did not test for benzene, but did register the concentration of Total Volatile Organic Compounds ("VOCs") as Diesel Fuel, finding concentrations of 270 mg/m³ and 320 mg/m³ from samples collected approximately three to four feet above ground surface. (Aug. 24 Schaefer Aff. Ex. 81-A, 81-B) (Docket #97-11). These two samples exceeded the American Conference of Governmental Hygienists time-weighted average standard of 100 mg/m³ for

---

[5]BP disputes the applicability of this sample because it was not collected using personal breathing zone devices worn by employees, was not collected at breathing zone level (in fact it was collected on the floor in a pool of contaminated water), and was collected while the ventilation fan was off. (DRPMF ¶ 6, Response).

[6]Much as Tilot disputes the applicability of OSHA PELs, BP disputes the applicability of NIOSH recommendations and EPA screening levels.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 5 of 35   Document 137

diesel fuel. (DRPMF ¶ 10); (PRPMF ¶ 81, Response).[7] Tilot does not assert that anyone took further samples for Total VOCs as Diesel Fuel.

March 2008 testing of near-slab soil gas outside Building D also showed benzene concentrations ranging from 500 μg/m³ to 280,000 μg/m³. (DRPMF ¶ 53); (June 30 Schaefer Aff. Ex. 36). In March 2010, further testing returned a benzene concentration within a well casing that intersects the floor of Building D's basement that exceeded the OSHA PEL. (DRPMF 56).

According to Tilot, the existence of the contamination at issue has led it to seal off the basement stairs in Building D in order to reduce employee exposure to any vapors rising from the basement to the main floor. (Wolf Aff. ¶ 14) (Docket #72). The existence of the contamination also has caused Tilot to continually maintain and operate the ventilation fan in the basement of Building D. (Wolf Aff. ¶ 15).[8] Tilot asserts that it cannot use Building D without continually operating the fan. (Wolf Aff. ¶ 15). By the same token, from 1977 until 2000, the basement of Building D was never used for any purpose, typically because there was water present. (PRPMF ¶ 10); (Tilot Dep. 90:4-8, Downey Aff. Ex. 1) (Docket #82-2). Tilot's expert also developed a benzene compliance program restricting employee activity in the basement of Building D, though it was not proposed until January 2010. (DRPMF

---

[7]Here BP points out that Hogan's report indicates that, because of the presence of gasoline fuel, the measure of Total VOCs as Diesel Fuel may be an over estimate. (Second Dutton Aff. ¶ 7) (Docket #105).

[8]Tilot also states in its proposed facts that the contamination has variously caused it to stop using the basement of Building D for business activities involving the prolonged presence of employees and that the vapors have rendered the basement uninhabitable and unuseable. However, as BP points out, the cited portions of Craig Wolf's affidavit do not directly support these statements. As such, the court has instead cited directly to Wolf's affidavit.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 6 of 35   Document 137

¶ 54); (Hogan Aff. Ex. A, at Ex. H) (Docket #74-1). Prior to this, there had been at least one occasion, in 2004, when fumes were so strong in the building that Tilot employees were forced to leave Building D. (Wolf Aff. ¶ 10). In 2009, four Tilot employees were seen for medical evaluation after chemical exposure and developing rashes. (DRPMF ¶ 63); (Dr. Sliwinski Report, Second Downey Aff. Ex. 83) (Docket #104-7). The examining doctor concluded that the rashes were not work-related and not the result of chemical exposure in the basement of Building D. (Dr. Sliwinski Report, Second Downey Aff. Ex. 83). A doctor more recently hired by Tilot has come to the opposite conclusion. (Borkowski Dep. 40:13-41:11, Second Downy Aff. Ex. 71) (Docket #104-3). Tilot also claims to have lost time spent by management and supervisory staff, as well as directed business resources toward the dispute at hand rather than focusing on growing business. (Wolf. Aff. ¶ 18).

Over the past two decades or so, BP and its predecessors have taken remedial actions regarding the contamination at issue. This remedial action has, more recently and to various degrees, taken place under the oversight of the Wisconsin Department of Natural Resources ("WDNR"). (PRPMF ¶ 58). More specifically, since 2008, BP has submitted quarterly reports to the WDNR. (PRPMF ¶ 60). BP's actions include: installing monitoring wells on the Tilot Site and thirty fluid recovery wells on the BP site; removing product and water from the basement of Building D; collecting groundwater samples from monitoring wells in October 2007 and June 2008; and conducting enhanced fluid recovery[9] at the BP and Tilot sites on June 24-26, 2008,

---

[9]Enhanced fluid recovery involves removal of free product from the subsurface through a network of wells. (PRPMF ¶ 64).

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 7 of 35   Document 137

August 12-14, 2008, October 14-16, 2008, and December 1-3, 2008. (PRPMF ¶¶ 61-63). Around June 2008, BP and the WDNR began to discuss a remediation system for the basement of Building D. (PRPMF ¶ 66). On June 8, 2010, BP, Tilot, and the WDNR reached an agreement on a remediation system for the Building D basement. (PRPMF ¶ 72). The system was constructed and started up on May 31, 2011, and remains in current operation today. (PRPMF ¶ 72). The WDNR approved the system and determined no additional remediation is necessary pending evaluation of that system. (PRPMF ¶ 73). Through these remedial actions, BP has removed varying amounts of contamination.[10]

---

[10]From 1991 to 1994, BP's environmental consultant recovered 19,116 gallons of product through a passive product collection trench. (DRPMF ¶ 37). Between 1994 and 1996, a groundwater recovery/total fluids collection system removed 1,594 gallons of product. (DRPMF ¶ 37); (Delta Action Report Excerpts, June 30 Schaefer Aff. Ex. 20). Between 1996 and 2000, hand bailing removed 80 gallons of product. (DRPMF ¶ 39). Between 1996 and 1997, pilot tests for enhanced fluid recovery extracted 366 gallons of product, though BP's consultant did not ultimately continue with this remedial method. (DRPMF ¶¶ 39-40). Between 1999 and 2001, during 18 groundwater gauging events, BP's environmental consultant recovered approximately 60 gallons of product by using a hand bailer. (DRPMF ¶ 39); (Dec. 21, 2001 Delta Report, June 30 Schaefer Aff. Ex. 22). Between March 2002 and October 2002 a solar-powered skimmer recovered 16 gallons of product. (DRPMF ¶ 39). Between 2004 and 2005 a horizontal trench soil vapor extraction system removed 341 gallons of product. (DRPMF ¶ 39). Between 2006 and 2007, additional enhanced fluid recovery removed 1,020 gallons of product. (DRPMF ¶ 39); (Mar. 24, 2010 Delta Report, June 30 Schaefer Aff. Ex. 22). Further enhanced fluid recovery recovered 2,829 gallons of product between February 2007 and December 2010. (DRPMF ¶ 38); (Jan. 17, 2011 Antea Report, June 30 Schaefer Aff. Ex. 21). That system continued until the end of May 2011 after which the currently operating total fluids recovery and soil vapor extraction system was started. (Nelson Aff. ¶ 5) (Docket #102).

Page 8 of 35

2.      Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine issue of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

3.      Discussion

As a beginning point, discussed below, the court will deny both of BP's motions with regard to striking from or adding to materials in the record before the court on summary judgment.  As to summary judgment, the court will grant BP's motion, and deny Tilot's motion, with regard to the claim under the Resource Conservation and Recovery Act.  However, a genuine dispute of material fact remains with regard to Tilot's tort claims, which are not barred by the economic loss doctrine, and thus the court will deny both parties' motions on those claims.  BP's arguments boil down to two key issues that exert primary control over the disposition of these motions: (1) whether Tilot can establish that the contamination may present an imminent and substantial endangerment to health or the environment; and (2) whether Tilot's tort claims are barred by the economic loss doctrine. Only Tilot moves for judgment on the merits of the tort claims, while BP merely opposes that motion should its argument regarding the economic loss doctrine fail.

3.1     Motions to Strike and Supplement

BP requests the court strike a series of exhibits for various reasons: Exhibit 3 to the Affidavit of James Drought contains information obtained after the expert disclosure deadline and the information was not disclosed to BP prior to filing for summary judgment;  Exhibits 29, 30, 36, 43, 49, and 53 to the June 30 Affidavit of Pamela Schaefer, Exhibits 11, 12-A, 71-D, 95, 118-D, and 131 to the August 24 Affidavit of Pamela Schaefer, and Exhibit 9-B to the September 14 Affidavit of Pamela Schaefer contain inadmissible hearsay and are not properly authenticated; and the report of Dr. Michael Borkowski contradicts opinions of two other experts previously retained by Tilot.  BP

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 10 of 35   Document 137

also moves to supplement the record with additional materials obtained after filing the motions for summary judgment, along with a supplemental brief.

BP cites Rule 56 and various cases to establish that the court should not consider these documents in deciding the summary judgment motion. However, motions to strike are generally disfavored as they most often serve only to delay proceedings. *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989); *W. Publ'g Co. v. MindGames, Inc.*, 944 F. Supp. 754, 755 n.1 (E.D. Wis. 1996). In this case, even considering all of the materials that BP wishes stricken, the court still finds in favor of BP on the Resource Conservation and Recovery Act claim, and against Tilot on its request for judgment on the merits of the tort claims. BP's only other request is for judgment on the tort claims under the economic loss doctrine, but that decision turns on a purely legal determination with no reference to facts offered in the materials sought to be stricken. As such, the consideration or non-consideration of these materials would not change the court's decision and, thus, the court will deny the motion. However, because the tort claims survive, the court will hold open the possibility that BP may later challenge the admissibility of any of these materials at trial through motions *in limine*. But for now, it is unnecessary to grant the motion.

For those same reasons, the court will deny the motion to supplement as well. Considering the materials originally submitted, without reference to the supplemental materials, is sufficient to rule on the summary judgment motions in BP's favor (with the exception of the economic loss doctrine, which, as discussed above, would likewise be unaffected by considering the additional materials). Again, any issues with regard to the admissibility of these materials at trial may be the subject of later motions *in limine*.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 11 of 35   Document 137

3.2     Resource Conservation and Recovery Act

Because the court concludes that no imminent and substantial danger to health or the environment exists, it will grant summary judgment to BP on this claim. Under the Resource Conservation and Recovery Act ("RCRA"), any person can bring an action against a person,

> including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). A *prima facie* claim under this citizen suit provision requires: "(1) that the defendant has generated solid or hazardous waste, (2) that the defendant is contributing to or has contributed to the handling of this waste, and (3) that this waste may present an imminent and substantial danger to health or the environment." *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 972 (7th Cir. 2002). Remedies available under the provision are limited to mandatory or prohibitory injunctions. *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996).[11] BP does not dispute that it is a generator of solid or hazardous waste, nor that it contributed to the handling of the waste in question. Instead, BP challenges only the existence of a possible imminent and substantial danger to health or the environment. BP also argues that, even if such a danger might exist, there is no remedy available. While the court disagrees with the general proposition that there

---

[11]A mandatory injunction requires a party to affirmatively take action regarding cleanup or disposal, while a prohibitory injunction restrains further violation of RCRA. *Id.*

is no possible injunctive relief available here, it does conclude that the evidence fails to establish that there may be an imminent and substantial danger to health or the environment, entitling BP to summary judgment.

The imminence standard does not require an existing harm, but the *threat* of harm must be present and ongoing. *Albany Bank & Trust Co.*, 310 F.3d at 972; *Meghrig*, 516 U.S. at 485-86. As to a substantial danger, the threat must be serious and "there must be some necessity for the action." *Price v. U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994); *see also Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007) (recognizing substantial endangerment "where there is reasonable cause for concern that someone or something may be exposed to risk of harm…in the event remedial action is not taken"); *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 259 (3d Cir. 2005) (equating "substantial" with "serious," as well as adopting same standard in *Burlington N.*).

While BP argues that Tilot has not offered sufficient evidence of potential endangerment, it also argues that there is no injunctive relief available. BP's basis for this argument is that it is already engaged in remediation overseen by the WDNR. Two cases illustrate why the court disagrees that ongoing remediation *automatically* creates a situation lacking a remedy, but also why, despite the fact that a remedy *could* be fashioned, there is no potentially imminent and substantial endangerment, making a remedy unnecessary here. In a Northern District of Illinois case, the court held that ongoing remediation did not bar a RCRA suit. *Spillane v. Commonwealth Edison Co.*, 291 F. Supp. 2d 728, 736-37 (N.D. Ill. 2003). Denying a motion to dismiss, the court noted that a major issue involved whether there had been proper investigation into the contamination, "which

brings into question whether the level and degree of ongoing remediation is appropriate." *Id.* at 737. In a different district court case, the plaintiffs argued that methane presented an actionable danger through the potential for explosion. *Adams v. NVR Homes, Inc.*, 135 F. Supp. 2d 675, 688-89 (D. Md. 2001). More than 175 tests over two-and-one-half years never detected explosive levels of methane in any plaintiff's home. *Id.* at 688. Moreover, remedial efforts taken by the defendants, combined with the testing evidence, showed "there [was] no longer a 'serious' threat coupled with 'some necessity for action.'" *Id.* at 689.

To begin, it is not the case that available injunctive relief is lacking in this case. As Tilot argues, potential injunctive relief could include ordering BP to install a barrier wall between the two properties in order to prevent further migration of contaminants onto the Tilot site. That remedial action is not currently being pursued by BP and the WDNR. Thus, if the court found it appropriate, it could issue a mandatory injunction requiring such. Further, the court agrees with the logic behind the *Spillane* court's decision. Simply because remediation is currently occurring does not eliminate the question of whether the extent of remediation is appropriate in order to abate a possibly imminent and substantial endangerment. It is conceivable that existing remedial action could be insufficient, leaving a continuing threat of substantial harm from contamination and, thus, a continuing RCRA violation. As such, the court finds that there is no lack of potential injunctive relief in this case. However, the existence of a potential remedy does not resolve the question of whether a remedy is necessary.[12] On that point, the

---

[12]BP's later briefing seems to recast its argument regarding lack of injunctive relief in this form.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 14 of 35   Document 137

court concludes that the evidence fails to establish a possible imminent and substantial endangerment to health or the environment.

### 3.2.1    Threat to Health

While RCRA does not require an existing harm, the court finds that test results for the conditions in Building D combined with currently ongoing remediation by BP foreclose a conclusion that any threat of harm is currently serious and necessitates action beyond that already being taken. Both parties focus their arguments on the presence and impact of benzene, a chemical classified as a human carcinogen.  Testing has shown that the levels of benzene present in the basement of Building D, while the ventilation fan is running, do not exceed OSHA PELs. Tilot disputes that this standard should be used at all, but the standard is at least relevant.  By the same token, the court disagrees with BP that the OSHA PELs are the *only* relevant standard. RCRA does not incorporate or otherwise rely solely on reference to regulatory standards, let alone any specific standard.  Thus, OSHA PELs, used to assess danger to employees, provide useful insight into whether employees are faced with harm or the threat of harm.[13]    As to other standards, the court agrees with BP that the EPA screening level sheds little insight on whether a possible imminent and substantial endangerment exists because screening levels are developed solely for the purpose

---

[13]Tilot argues that because benzene is present as a result of outside forces and not the normal work environment, it is a non-occupational health risk rather than occupational.  However, Tilot's citations never support the inapplicability of occupational health standards in assessing endangerment.  At most, Dr. Hogan's testimony establishes that OSHA PELs were not developed in response to non-occupational *sources* of exposure, but does not explain why workers, otherwise safely (by regulatory standards) allowed to be exposed to 1.0 ppm of benzene, cannot be exposed to that level if benzene does not originate in their workplace. (Aug. 24 Schaefer Aff. Ex. 85-B) (Docket #97-15).

of setting a level at which further investigation is required; they are not a determination of actual danger. *Risk-Based Concentration Table – FAQ: Why are SLs used?*, U.S. Environmental Protection Agency, http://www.epa.gov/reg3hwmd/risk/human/rb-concentration_table/faq.htm#FAQ2 (last updated Dec. 6, 2011); (*see also* Third Dutton Aff. ¶¶ 2-6) (Docket #113). Tilot also urges that Wisconsin's VAL standards are relevant, and that other sampling has exceeded the VALs, establishing sufficient endangerment. But, similar to EPA screening levels, VALs are used to determine whether further action is required. Specifically, where indoor air exceeds a VAL the exposure of building occupants should be reduced, the extent of vapor migration from the subsurface to indoor air should be determined, and on-going migration of vapors into the indoor air should be remediated.[14] (Aug. 24 Schaefer Aff. Ex. 87-C, at 15-16) (Docket #97-15). Here, the ventilation fan operation and other remedial activities are already occurring. Thus, exceedance of Wisconsin's VALs tells the court only that *something* should be done, not that the current remediation is insufficient to abate a threat of substantial harm. On the other hand, NIOSH recommendations, while not legally binding, are recommendations made to OSHA and based on scientific study. National Oceanic and Atmospheric Administration, *Recommended Exposure Limit (REL)*, Field Guide to Toxic Levels of Concern, http://chemresponsetool.noaa.gov/LOC_guide/REL.htm (last visited Jan. 3, 2012). Lacking the force of law does not mean such recommendations lack the force of science as pertains to what constitutes a

---

[14]In fact, the VAL guidelines suggest, aside from remediation, that a negative pressure gradient between the sub-slab and indoor air be used to mitigate vapors. (Aug. 24 Schaefer Aff. Ex. 87-C, at 16-17). This is, in fact, a feature of the now-running remedial system. (PRPMF ¶ 107).

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 16 of 35   Document 137

risk to health or the environment. Addressing two other types of samples put forth by Tilot, the near-slab samples taken from outside of Building D are not relevant to the court's endangerment analysis as they explain little, if anything, about inhalation exposure of those inside Building D. Finally, though samples taken from inside the well casings also exceeded the OSHA PEL for benzene, that exceedance is also irrelevant to inhalation exposure because a sample from a well casing is not representative of indoor air or breathing zone exposure. (Third Lundegard Aff. ¶ 6) (Docket #107); (Fourth Lundegard Aff. ¶¶ 2-4, 6) (Docket #116).

Even looking to Tilot's asserted measure of the danger presented by benzene, relevant exceedances of any standard have only been shown when the ventilation fan was not running, or were procured from tests that occurred within the sealed well casing, not the ambient air found in the basement of Building D. Thus, when the fan is running, there is no substantial threat. And, while there may still be *some* threat of harm, through the possibility of the fan being shut off or losing power, that harm is not substantial or serious in that it necessitates action; it is simply too remote.[15] To the extent VALs have been exceeded even while the fan was running, that standard simply does not speak to the presence or level of threat after remediation has begun. In addition to the lack of convincing test samples, Tilot has never really used the basement for any activity in the first instance, and BP is currently engaged in remedial activities beyond simple fan operation. Moreover, as Tilot itself has noted, the WDNR has stated that it

---

[15]Were that a sufficient threat, then likely no injunctive relief in a RCRA case could be considered an effective remedy since Murphy's Law would create an ever-present threat through human error or other complications that may arise in *enacting* a remedy.

would pursue enforcement action against BP if it did not comply with remediation requests. (Downey Aff. Ex. 29) (Docket #82-6).

Tilot disputes the effectiveness of current remedial action, arguing that the newly installed system in fact increases the level of endangerment by increasing the draw down of the water table and leading to increased migration of contamination from the BP Site to the Tilot Site. However, Tilot itself, in responding to BP's proposed statement of facts, noted that it had originally objected to the technical adequacy of BP's suggested remedial system because the planned wells were not deep enough and that deeper wells would allow for greater flexibility and *a more aggressive final remedy by creating greater draw down.* (PRPMF ¶ 70, Response); (*see also* Aug. 24 Schaefer Aff. Ex. 70-D) (Docket #97-9); (PRPMF ¶ 69, Sentence 2, Response). Though the addition of a physical barrier might help prevent further migration of contamination between the sites, Tilot's environmental consultant noted that contaminant flow from the BP Site could also be addressed through operation and system controls. (Aug. 24 Schaefer Aff. Ex. 70-D, at 2). In sum, greater draw down could actually contribute to more efficient treatment, and to the extent it promotes contamination migration, no facts show that the increased migration, in and of itself, will create *additional* threat of harm or increase the seriousness of any existing threat sufficient to raise any possible endangerment to the level of a RCRA violation. And in any event, as noted, the system can control draw down and its effect on migration without the physical barrier.

The combination of the fact that Tilot has never really used the basement for any activity in the first instance, that BP is currently engaged in remedial activities, and the lack of any relevant exceedances while the

ventilation fan is running places the threat of harm outside that sufficient for a RCRA violation. Given the apparent effectiveness of the fan, in combination with BP's ongoing efforts, overseen by the state under threat of enforcement action, any threat of harm is currently minor and no remedy is necessary beyond that already occurring. It might be different were Tilot simply forced to run a fan while BP did nothing else to clean the contamination, but that is not the case.[16]

Tilot argues that various cases establish that endangerment may continue to exist despite ongoing cleanup, and that BP's current remedial actions do not preclude the RCRA claim. In the one case cited from this district, there was no ongoing cleanup by the defendant; it appears that the plaintiff may have been continuing to undertake its own cleanup efforts, but the case is, therefore, distinguishable from the case at hand. *Raytheon Co. v. McGraw-Edison Co.*, 979 F. Supp. 858, 861-62 (E.D. Wis. 1997). At most, the court in that case found endangerment where contaminated soils remained on the property and the defendant was not engaged in a cleanup. *Id.* at 62. Another case, from the Western District of Michigan, cited for the same proposition, again deals with a situation wherein the plaintiff, not the defendant, was engaged in remedial action. *Organic Chems. Site PRP Grp. v. Total Petroleum, Inc.*, 6 F. Supp. 2d 660, 665 (W.D. Mich. 1998). Tilot cites two other cases, somewhat more persuasive, but from outside the circuit. In one, the court held summary judgment was inappropriate, despite the defendants' claim that they were sincerely attempting to remediate

---

[16]Ultimately, Tilot's argument appears to be that BP is simply not doing enough regarding the speed of cleanup. However, RCRA is not intended to remedy such a situation so long as there is no potentially imminent and substantial endangerment.

Case 2:09-cv-00210-JPS    Filed 01/17/12    Page 19 of 35    Document 137

contamination, primarily because no discovery had commenced and the parties disputed the status of remediation. *Kara Holding Corp. v. Getty Petroleum Marketing, Inc.*, 67 F. Supp. 2d 302, 311-12 (S.D.N.Y. 1999). While the *Kara Holding* court did note that the defendant, though claiming sincere remediation, had not claimed cleanup was complete, *id.*, the case has little to say about the action here given the lack of information on the remediation in that case. Finally, Tilot's most persuasive case comes from the Southern District of New York in which the court found that ongoing remediation by the state environmental agency did not foreclose the RCRA action because cleanup was not complete, citing to *Kara Holding*. *87th St. Owners Corp. v. Carnegie Hill-87th St. Corp.*, 251 F. Supp. 2d 1215, 1218-19 (S.D.N.Y. 2002) ("endangerment that *may* justify RCRA relief continues to exist" until cleanup complete (emphasis added)). But to the extent those cases hold that endangerment continues to exist until cleanup is completed, this court disagrees that such a conclusion is compelled in all cases. Determining whether sufficient endangerment exists under RCRA is fact-specific, and adopting such a *per se* rule would be both unwise and antithetical to the purpose of the statute.[17] As such, these cases do not disturb the court's reasoning, and the court concludes there is no potentially imminent and substantial danger to health.

---

[17]What's more, the court's earlier reasoning regarding the availability of injunctive relief supports this point. To hold that ongoing remediation does not foreclose injunctive relief, and that a court should instead analyze the facts of an ongoing cleanup within the endangerment framework, would be at odds with simultaneously holding that ongoing remediation has no bearing on the endangerment analysis.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 20 of 35   Document 137

### 3.2.2 Threat to the Environment

The court, likewise, finds no potentially imminent and substantial endangerment of the environment. Importantly, the court's reasoning with regard to the ongoing remediation is equally applicable here. The current state of remediation and lack of evidence as to that remediation being so insufficient as to perpetuate a possible imminent and substantial endangerment (even assuming there is one in the first place) indicate again that *further* remedial directives from this court are not necessary. Moreover, regarding the extent of endangerment even ignoring the current remediation, there is a lack of evidence to establish a serious and ongoing threat. The current contaminant plumes do not threaten the nearby Fox River. Though a lack of ongoing remediation might allow a finding of endangerment to the environment without threat to the Fox River, the combination of those two factors here foreclose a finding that any threat to the environment is sufficiently serious, that is substantial, to trigger RCRA liability.

Tilot's only passing argument is that groundwater contamination constitutes imminent and substantial endangerment *per se.*[18] For this proposition, it cites a Southern District of Illinois case that did not actually make such a holding. *United States v. Apex Oil Co.*, No. 05-CV-242, 2008 WL 2945402, at *80 (S.D. Ill. July 28, 2008). Instead, the *Apex Oil* court merely recognized that the Third Circuit had stated that proof of contamination exceeding regulatory standards "*may* alone suffice" under RCRA, while the Northern District of New York found that leaking pipes underground

---

[18]In fact, in its reply brief, Tilot appears to mostly abandon the argument that the contamination presents a threat to the environment, focusing on the threat to health.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 21 of 35   Document 137

constituted a sufficient threat because groundwater samples exceeded safe drinking water standards. *Id.* Moreover, in both cases cited in *Apex Oil*, no remediation was taking place at the time of the lawsuit, thus distinguishing those cases from the case at hand. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 252-53 (3d Cir. 2005) (interim remedial measures were put in place 13 years prior to suit, followed by a consent order two years prior to suit under which remedial steps were not taken or completed); *United States v. Hill*, No. 95-CV-1716, 1998 WL 278291, at *1-2 (N.D.N.Y. May 20, 1998) (no cleanup prior to suit, which was brought by government to enforce administrative order requiring cleanup). Further, in *Apex Oil* itself, the contamination of groundwater was not only already present, but *continuing* by reason of contamination from accumulated waste leeching into groundwater. 2008 WL 2945402, at *80; *see also Interfaith*, 399 F.3d at 261-62 (district court found present and continuing pathways for exposure creating endangerment). Tilot has not shown or alleged here that a source of contamination is *continuing* to further contaminate the groundwater which enters the basement of Building D, but rather that the groundwater itself is simply already contaminated. But because this is already the subject of ongoing remediation, that Tilot has not shown is insufficient to abate any potential endangerment, this is not a case where the simple fact of existing groundwater contamination qualifies as endangerment *per se*. As such, the court finds a lack of potential imminent and substantial endangerment to health or the environment and will, therefore, grant summary judgment to BP on this claim.

### 3.3 Tort Claims and the Economic Loss Doctrine

BP next argues that Tilot's claims for trespass, nuisance, and negligence are barred by the economic loss doctrine. However, Tilot first responds that the issue has already been adjudicated and that *res judicata* prevents BP from relitigating the issue. Tilot then argues for a grant of summary judgment on the merits. BP has not moved for judgment on the merits, but merely opposes such a grant to Tilot.

#### 3.3.1 Economic Loss Doctrine and Issue Preclusion

The court holds that the economic loss doctrine continues to be inapplicable in this case, regardless of whether issue preclusion might otherwise apply to bar relitigation of the issue. Issue preclusion bars relitigation of an issue actually litigated or decided in a prior action. *Aldrich v. Labor and Indus. Review Comm'n*, 2011 WI App 94, ¶ 20, 334 Wis. 2d 495, 801 N.W.2d 457. Issue preclusion also applies to prior adjudications within the same lawsuit. *Estate of Rille v. Physicians Ins. Co.*, 2007 WI 36, ¶ 41 & n.21, 300 Wis. 2d 1, 728 N.W.2d 693. The requirement of actual litigation requires the issue to be properly raised, submitted, and determined. *City of Sheboygan v. Nytsch*, 2006 WI App 191, ¶ 12, 296 Wis. 2d 73, 722 N.W.2d 626.

By order of July 15, 2009 (Docket #30), Judge Randa denied BP's earlier Motion to Dismiss, which urged that Tilot's tort claims were barred by the economic loss doctrine. Tilot is correct that BP's current arguments track the arguments and cases cited in its earlier motion almost to a tee. However, BP argues that issue preclusion does not apply here because of the differences between a motion to dismiss and a motion for summary judgment. In support, it cites to *Federal Practice and Procedure* for the proposition that

if the defendant submits a "naked motion" to dismiss under Rule 12(b)(6) and it is decided without conversion [into one for summary judgment], he or she later should be permitted to move under Rule 56 for summary judgment. The two motions are not the same. A party who challenges the face of the pleading for insufficiency in stating a claim for relief ought not to forfeit the right to attack the merits of an opponent's case as not being trialworthy on the basis of affidavits and other supporting material.

5C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1387 (3d ed. 2004). Despite the disagreement, the court finds it unnecessary to resolve whether issue preclusion applies because the bulk of Judge Randa's analysis remains undisturbed, and the court, even in reconsidering the issue, continues to find that the economic loss doctrine does not apply in this case.

The economic loss doctrine prevents a commercial purchaser from recovering solely economic damages from the manufacturer under tort theories where the parties have the opportunity to allocate risk of loss through the contracting process. *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 437 N.W.2d 213, 215-18 (Wis. 1989). The doctrine serves to: (1) maintain the distinction between tort and contract law; (2) protect freedom to allocate economic risk by contract; and (3) encourage the commercial purchaser to assume, allocate, or insure against risk of economic loss. *White v. Marshall*, 693 F. Supp. 2d 873, 879 (E.D. Wis. 2009) (citing *Harley-Davidson Motor Co. v. Powersports, Inc.*, 319 F.3d 973, 985 (7th Cir. 2003)). While the doctrine originated in the context of contracting for products or goods, Wisconsin courts have held the doctrine to apply to commercial real estate transactions as well. *Mose v. Tedco Equities-Potter Rd. Ltd. P'ship*, 598 N.W.2d 594, 599-600 (Wis. Ct. App. 1999). Wisconsin courts apply the doctrine even in cases where there is an "absence of privity."

*Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 844 (Wis. 1998); *see also Mose*, 598 N.W.2d at 598.

Despite BP's reliance on those holdings, there are critical distinctions from the instant case that fail to convince the court that Wisconsin's application of the doctrine in the absence of contractual privity would necessarily extend to the situation here. In *Daanen*, the Seventh Circuit certified a question to the Wisconsin Supreme Court which it ultimately framed as "whether the economic loss doctrine applies where no privity of contract exists between the *manufacturer and remote commercial purchasers.*" 573 N.W.2d at 846 (emphasis added). There, the defendant manufactured rock crushing equipment and sold it to distributors who then resold the products, in this case a distributor resold equipment to the plaintiff. *Id.* at 843-44. The plaintiff's purchased equipment failed repeatedly, the failures were ultimately attributed to manufacture and design problems, and so the plaintiff brought suit against the defendant manufacturer. *Id.* at 844. The court restated the three underlying policies noted above, within the context of applying the doctrine "between commercial parties." *Id.* at 846 The court discussed the first policy, maintaining the distinctions between contract and tort law, by explaining that: "[c]ontract law rests on obligations imposed by bargain….Accordingly, the individual limited duties implicated by the law of contracts arise from the terms of the agreement between the particular parties." *Id.* It continued by observing that the "law of torts, on the other hand, rests on obligations imposed by law." *Id.* The court quoted the U.S. Supreme Court which earlier wrote that the distinction between contract and tort "rests…on an understanding of the nature of the responsibility *a manufacturer must undertake in distributing its products.*" *Id.* at 847 (emphasis

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 25 of 35   Document 137

added) (quoting *E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871 (1986)). The Wisconsin Supreme Court continued, describing economic loss, unrecoverable in tort, as a loss suffered "because a product failed in its intended use," noting that "[a] manufacturer in a commercial relationship has no duty under [tort law] to prevent a product from injuring itself. The duty to provide a product which functions to certain specifications is contractual." *Id.* (citation omitted).

These considerations, particularly references to manufacturers, remote purchasers, and distribution, make it clear that, though the court saw fit to extend the doctrine to cases where the parties lacked contractual privity, it still contemplated some connection through the chain of distribution or sale. BP and Tilot not only lack contractual privity, but they have no relationship within the chain of sale regarding the Tilot Site.[19] The two are no more commercial parties to the Tilot Site real estate transaction than any other neighbors are parties to the transaction passing ownership of an adjacent lot. BP simply does not fit the role of a "manufacturer."[20] Nor is this situation analogous to one in which the product injures itself or otherwise does not

---

[19]Though BP was once an owner of the Tilot Site, that is irrelevant in this context because, as discussed below, the damage to the Tilot Site for which Tilot is suing came as a result of outside action on an unrelated property, not action on the Tilot Site by any of the prior owners. Thus, because the BP Site and Tilot Site are independent, the court is analyzing BP only as the owner of the BP Site, for it is only from BP's ownership of the adjacent site that Tilot's tort causes of action arise.

[20]In *Mose*, which extended the economic loss doctrine to real estate transactions, the court cited and approved of cases from this district analogizing the land at issue with a "product" for purposes of the doctrine. *Mose*, 598 N.W.2d at 600. Thus, it follows that the party being sued must be analogous to a manufacturer or distributor within the context of the doctrine. In the case of real estate transactions, an original vendor, owner, or occupier might suffice.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 26 of 35   Document 137

function as intended through manufacturer error. Manufacturer error presumes the deficiency of the product, here land, is the fault of the manufacturer, i.e., the vendor or similarly situated party in a real estate transaction. Instead, the defect at issue here is one allegedly caused by an outside force, namely migration of off-site contamination released by a third party; not contamination released on-site by someone in the chain of prior ownership or occupation. Additionally, BP's alleged duty here, to avoid contamination of the Tilot Site, did not arise solely by way of Tilot having purchased the site. BP, as a neighboring landowner, has duties imposed by law to avoid negligence, trespass, and nuisance that would exist regardless of whether Tilot purchased the site after BP had committed the alleged transgressions. To argue otherwise is to argue that a tortfeasor becomes immune from liability the moment a transfer of land occurs; or that all parties in real estate transactions must contract around the risk of another party committing a tort entirely outside the control of the seller. Thus, application of the economic loss doctrine here would not fulfill the first policy goal underlying the doctrine.

As to the second policy goal, the *Daanen* court wrote that the economic loss doctrine recognizes the importance of enforcing bargains rather than allowing tort remedies to sidestep the bargain. 573 N.W.2d at 847. The court elaborated that if remote purchasers are allowed tort recovery against manufacturers, "the entire risk of economic loss is borne by that manufacturer. If no such action is permitted, the manufacturer and its distributors and purchasers are free to allocate the risk…." *Id.* As an example, the court noted that not applying the doctrine would encourage remote purchasers to purchase goods as-is for a lower price, seemingly bearing full

risk of loss and then "[i]f the product does fail down the road, the commercial purchaser could still *reach all the way back through intervening transactions, contracts, and warranties to sue the original manufacturer* in tort." *Id.* at 848 (emphasis added). This analysis again contemplates a relationship in which the "tortfeasor" manufacturer is connected to the ultimate buyer by way of the distribution or sales process, but, as noted, BP does not stand in the same position as a manufacturer or prior seller/vendor. As to enforcing bargains, not only did Tilot lack an opportunity to negotiate regarding BP's potential liability for migrating contamination, but BP itself could not negotiate regarding its liability for releases on an adjacent property. The focus of the second policy goal is primarily the protection of the manufacturer. But here, failing to apply the doctrine will not deprive BP of freedom to contract around potential liability for contamination migrating from the neighboring site; it did not bargain with the Tilot Site's prior owner over tort liability from the BP Site which in turn could have or should have been bargained over by Tilot itself and the prior owner, and which Tilot is now attempting to sidestep with this tort action against BP. BP bears the same risk of loss for its allegedly tortious activity as any other landowner, not a party to a neighbor's real estate transaction, bears for tortious activity. Thus, the freedom to allocate economic risk is not implicated here.

As to the third policy, the *Daanen* court explained that allowing a remote purchaser to recover in tort might hamper the efficiency of commercial markets. 573 N.W.2d at 849. "[T]he question whether this court should impose tort liability on manufacturers distills to whether the consuming public as a whole should bear the cost of economic losses sustained by those commercial purchasers who failed to bargain for adequate

contract remedies." *Id.* at 849-50.  The court noted that manufacturers, once liable, would include resulting costs in the price of products, passed on to the consuming public and becoming a public subsidy or premium for purchasers who chose not to insure against risk.  *Id.* at 850.  But here, BP was never involved in the sale of the Tilot Site, nor will potential tort liability against it manifest itself in the future pricing of land across the real estate market as a whole.  The policy of encouraging the purchaser to insure against risk of loss is, again, simply not implicated here.

   *Mose* does not change the court's analysis.  In *Mose*, one of the defendants, Empire, manufactured devices on property it leased from E.L.M.  598 N.W.2d at 596.  During the course of its operations, Empire deposited numerous hazardous substances on the property.  *Id.*  Empire later moved its operations off the property and, subsequent to this, co-defendant Tedco purchased the property from E.L.M.  *Id.*  The plaintiff, Mose, later entered a purchase agreement with Tedco for the property under which Tedco agreed to remediate the contamination. *Id.* at 597. Tedco then sued Empire for damages related to the contamination, and the parties entered a settlement agreement in which Empire agreed to perform the cleanup.  *Id.*  Mose later brought suit against Tedco and Empire, alleging five tort causes of action against Empire.  *Id.*  In affirming application of the economic loss doctrine to the claims against Empire, the appellate court noted that the plaintiff was essentially arguing that lack of privity between it and Empire precluded application of the doctrine.  *Id.* at 598.  The court simply stated that *Daanen* had settled that point to the contrary.  *Id.*  The court continued, noting that Mose had knowingly assumed the risk upon entering the transaction and had obtained warranties from Tedco in exchange for a reduced purchase

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 29 of 35   Document 137

price.  *Id.*  The court concluded that Mose could not "now expect to circumvent the contract to sue the *original owner/occupier* for a tort recovery for his economic losses."  *Id.* at 599 (emphasis added).  Thus, while not exactly analogous to *Daanen*, the *Mose* case illustrates that a lack of privity is no bar where there remains some connected chain of privity between the plaintiff and the party sought to be sued in tort.  While Empire never specifically owned the property, it occupied and operated on the property as a lessee, subject to the same opportunity to bargain with regard to liability for the condition of the property with E.L.M.  E.L.M., in turn, had a full opportunity to bargain with regard to liability when it sold the property to Tedco, and the same can be said as between Tedco and Mose.  Thus, to allow Mose to "reach back" through prior transactions, contracts, and warranties to sue Empire would violate the policy goal of maintaining the distinction between tort and contract law.  It would also restrict Empire's freedom to negotiate around liability when entering leases, and would allow Mose to sidestep the risk of loss around which it had bargained in its purchase agreement with Tedco.  But here, as explained above, BP was never involved in the chain of sale.  Further, even if the court were to look solely to the relationship between Tilot and the prior owner, there was no real opportunity to bargain around the risk of loss because the prior owner *could not effectuate a cleanup of the BP Site*.  The prior owner had absolutely no control over BP's actions on that site.  And, given that the *source* of the contamination rests on the BP Site, and that no cleanup on the Tilot Site can be complete until contamination no longer migrates from the BP Site, this case is plainly distinguishable from *Mose*, wherein Empire, as a lessee of the

property in question, deposited the contamination directly onto that property.

Ultimately, a case from Indiana, while not binding, tracks the court's position nicely. First recognizing and agreeing with Wisconsin's three policy goals underlying the doctrine, the Indiana court found the doctrine did not bar a negligence action by a landowner against a former owner of adjacent land for damage due to contaminated ground water that occurred off-site, prior to the plaintiff's ownership, and migrated onto the plaintiff's land. *KB Home Indiana Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 303-05 (Ind. Ct. App. 2010). As the *KB Home* court put it, the vendor's "breach of warranty that the land was free of hazardous materials does not absolve Rockville of responsibility for *its* negligent conduct that may have caused the contamination." *Id.* at 305. In sum, while contractual privity is not necessary to the application of the economic loss doctrine, BP is not situated as a party against whom the doctrine precludes actions in tort because it is a neighboring land owner, not one of the previous vendors, owners, or occupiers, and is alleged to have committed a tort by releasing substances off-site that have migrated onto the site in question. The court will deny BP's motion for summary judgment on the tort claims.

### 3.3.2   Negligence, Trespass, and Nuisance

Moving to the merits of Tilot's tort claims, there remain genuine disputes of material fact, preventing a grant of summary judgment. Negligence requires establishing: "(1) the existence of a duty of care…(2) a breach of that duty of care, (3) a causal connection between the…breach…and the…injury, and (4) actual loss or damage resulting from the injury." *Dyer v. Blackhawk Leather LLC*, 2008 WI App 128, ¶ 18, 313 Wis.

2d 803, 758 N.W.2d 167. Duty is a question of law, and in Wisconsin "everyone owes to the world at large the duty of refraining from those acts that may unreasonably threaten the safety of others." *Tesar v. Anderson*, 2010 WI App 116, ¶ 5 n.8, ¶ 6, 329 Wis. 2d 240, 789 N.W.2d 351. Determining whether a duty exists depends upon the circumstances. *Id.* at ¶ 6 n.10; *see also Hocking v. City of Dodgeville*, 2009 WI 70, ¶ 12, 318 Wis. 2d 681, 768 N.W.2d 552 ("the duty owed to the world is not unlimited but rather is restricted to what is reasonable under the circumstances").

BP attempts to argue that Tilot has not established that it owes a duty, but its arguments essentially appeal to what it sees as a lack of facts to establish the "circumstances" under which BP supposedly owes a duty.[21] However, it is clearly reasonable for an owner and operator of a bulk petroleum storage business to owe a duty of care to others not to cause injury through the release of hazardous substances into groundwater. Thus, the court is convinced that BP owes a duty toward Tilot in this case.

As to the remaining elements, however, there remain genuine disputes of material fact. BP does not argue that the facts entitle it to judgment on this claim, only that there remain disputes sufficient to foreclose a grant of summary judgment to Tilot. With respect to the element of breach, the facts show that a reasonable jury could conclude that BP has not breached its duty, given that it has engaged in remediation and worked with the WDNR. Causation also remains in dispute, given that there is evidence of contamination originating from the Tilot Site in addition to the BP Site. A reasonable jury could view the evidence of contamination from the Tilot Site

---

[21]In fairness, Tilot also seems to confuse the issue slightly in the duty portion of its supporting brief.

Case 2:09-cv-00210-JPS   Filed 01/17/12   Page 32 of 35   Document 137

as having caused the injury in question. In fact, Tilot's argument that "any minor surface spills that may have occurred on the Tilot Site prior to Tilot's ownership cannot account for the huge levels of petroleum contamination currently present" implicitly recognizes a factual dispute.

Finally, while Tilot does not request judgment as to the amount of damages, it still must establish that loss or damage has occurred in order for the court to grant it judgment on the claim of negligence. For example, damage might include repair and replacement costs, diminution in property value, lost profits or lost use of property. *See Midway Motor Lodge of Brookfield v. Hartford Ins. Grp.*, 593 N.W.2d 852, 857 (Wis. Ct. App. 1999) (listing examples of damages that might satisfy fourth element of negligence claim when attempting to state a claim for faulty sewer system and repair). Tilot, to establish that it has suffered damage, points to: physical illness of employees; the sealing of Building D's basement; the inability to use Building D without continuing operation of a blower; loss of time by supervisory staff addressing the issues; and redirection of business resources to this dispute rather than growing business. While some of the alleged damages, such as physical illness of employees and "redirection" of resources to this dispute, appear to be non-compensable,[22] Tilot has otherwise alleged injuries from which damages flow, including the sealing off and loss of use of Building D's basement. While BP argues that Tilot has never used the basement for any business purposes, the loss-of-use itself remains an injury with an associated loss; the actual measure of that loss is a question for the jury. In any event,

_____

[22]Physical harm to employees are injuries that accrue to the employees, not to Tilot, and "redirection" of resources sounds suspiciously like a request for litigation costs.

BP opposes only the granting of summary judgment, and Tilot's inability to establish a lack of genuine dispute regarding the material elements of breach and causation require the court to deny Tilot's motion with regard to its claim for negligence. Any dispute as to what damages are compensable may be briefed and argued in more detail when it comes time to construct the jury instructions and verdict form.

As to Tilot's claims for trespass and nuisance, both require a plaintiff to establish the defendant was either negligent or reckless. *Fortier v. Flambeau Plastics Co. a Div. of Flambeau Corp.*, 476 N.W.2d 593, 608 (Wis. Ct. App. 1991) (trespass is intentional or unintentional intrusion "resulting from reckless or negligent conduct" or abnormally dangerous activity; private nuisance may occur by unintentional invasion of private use and enjoyment of land that is otherwise actionable under rules controlling liability for negligent or reckless conduct). Here, because the court has found that genuine issues of material fact remain in dispute as to BP's alleged negligence, those same disputes also prevent granting Tilot summary judgment on its claims for trespass and nuisance.[23]

Accordingly,

_____

[23]The same holds true even under a standard of recklessness, as that standard generally requires conduct creating an unreasonable risk of harm, knowledge or reason to know of the risk, and action in disregard or indifference to that risk. *See* Restatement (Second) of Torts § 500 & cmt. a. It is a higher standard than negligence. *Id.* § 500 cmt. a. Thus, if there is an open question as to whether BP breached its duty, regardless of knowledge or indifference, there is similarly an open question as to whether it acted in indifference to or disregard of an unreasonable risk which it knew or should have known existed.

IT IS ORDERED that the defendant's Motion to Strike (Docket #120) be and the same is hereby DENIED. The parties may raise related issues in any later motions *in limine*;

IT IS FURTHER ORDERED that the defendant's Motion for Leave to File Supplemental Memorandum, Proposed Facts, and Affidavit (Docket #125) be and the same is hereby DENIED. The parties may raise related issues in any later motions *in limine*;

IT IS FURTHER ORDERED that the plaintiff's Motion for Summary Judgment (Docket #67) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendant's Motion for Summary Judgment (Docket #75) be and the same is hereby GRANTED in part and DENIED in part. Summary judgment is granted to the defendant as to the plaintiff's first claim, for violation of the Resource Conservation and Recovery Act.

Dated at Milwaukee, Wisconsin, this 17th day of January, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge